IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN PETERS,<br>          Plaintiff, | |
| vs. | Civil Action No. 10-1315<br>U.S. Magistrate Judge Maureen P. Kelly |
| SANDRA M. CRAFT and<br>BROOKVILLE AREA SCHOOL<br>DISTRICT,<br>          Defendants. | [ECF No. 17] |

## **OPINION**

KELLY, Magistrate Judge

In this 42 U.S.C. § 1983 civil rights action alleging violations of the First Amendment, the Court will grant the Defendants' pending Motion to Dismiss the Second Amended Complaint. [ECF No. 17].

**I. BACKGROUND**

In the Second Amended Complaint [ECF No. 15], Plaintiff, John Peters, ("Peters" or "Plaintiff"), alleges that his First Amendment rights were violated by the Brookville Area School District ("the District") and its Superintendent and ex officio member, Sandra M. Craft ("Craft"), when he was banned from school property.

According to the Second Amended Complaint, Plaintiff's son, Bradley, was, at all relevant times, a sixth grader at Hickory Grove Elementary School. [ECF No. 15 at ¶ 12]. On June 1, 2010, Bradley was stabbed in the arm with a sharpened pencil by another student, allegedly in response to a provocative comment made by Bradley. [Id. at ¶14]. Bradley was sent to the nurse's office, but was not treated for approximately two hours, because the school nurse was unavailable. When he was seen, the nurse placed a Band-Aid over the area. [Id. at ¶¶ 15-

17]. Plaintiff and his wife were not notified of the injury. [Id.].

Later the same day, when Plaintiff's wife arrived at the school to take Bradley to a scheduled doctor's appointment, he produced a note from his teacher, addressed to Plaintiff and his wife, stating that Bradley had used "inappropriate language" in speaking to a fellow student. The note did not mention the pencil portion of the incident, and, apparently, neither did Bradley. Later in the day, the Plaintiff noticed the Band-Aid on his son's arm and asked what had happened. Upset, Plaintiff called the school for a full account of the altercation, but the school was closed. Plaintiff's wife then took Bradley to the police station in Brookville, where he related the events of the day to Officer Markle. [Id. at ¶¶ 20-23]. Officer Markle listened, and inquired about the extent of Bradley's injuries, which seem to have been minimal. [Id. at ¶24].[1]

Over the next two days, Plaintiff had "friendly conversations" with his son's teacher, the school principal, and Craft regarding "his concerns with the handling of the stabbing incident involving his son." [Id. at ¶¶ 25-34]. Craft told Plaintiff that she would look into the matter and contact him the next day. [Id. at 35]. As of June 8, 2010, Plaintiff had heard nothing. On that day, he encountered the school principal while he and his wife "were dropping off items for his child's class." [Id. at ¶ 36]. Plaintiff again expressed concern about the handling of the incident, and was told that he should complete a complaint form and "submit it to the Superintendent at the administration office." [Id. at ¶ 38]. Plaintiff went to the administration office, obtained the proper form, and asked the secretary whether the school had retained the pencil. [Id. at ¶39]. Presumably having been told no, Plaintiff and his wife proceeded to the Brookville police station to see if the pencil had been sent there. During his visit to the station, Plaintiff spoke with Officer Markle, and learned that the police intended to charge his son with disorderly conduct

---

[1] The facts do not show that the Plaintiff's son suffered any lasting or serious injury. In fact, the school nurse did see not any pencil lead in or on the child's skin.

based on the comment that instigated the altercation. They did not "intend to charge the [other] student with any crimes." [Id. at ¶ 41]. Plaintiff questioned this decision, but Officer Markle stated that the case was closed. [Id. at ¶ 42].

After completing and filing the complaint form at the District's administrative offices, Plaintiff returned yet again to the Brookville police station to speak with the Chief of Police, Ken Dworek ("Dworek"), regarding the decision not to charge the other student. "On his way into the police station, Plaintiff encountered Officer Markle." [Id. at ¶ 51]. "Officer Markle approached Plaintiff in the parking lot and asked him why he was back . . . Markle then became aggressive with Plaintiff, standing toe-to-toe with him, and yelling in Plaintiff's face." [Id. at 52]. When the Plaintiff entered the police station, Chief Dworek, "like Officer Markle, became loud and aggressive toward Plaintiff." [Id. at 53]. Chief Dworek reiterated that the case was closed, that no additional charges would be filed, and that the matter had been handled appropriately. [Id. at ¶54].

On June 10, 2010, Plaintiff and his wife received a letter from Craft, sent at Chief Dworek's behest. Craft wrote:

> Your recent behavior displayed on school grounds and at the police station is determined to be a threat to the safety and security of our staff. John Peters is not permitted to be on school property for any reason. Stacy Peters may drive to the front entrance of the school and school personnel will walk their child to the door to be released to the custody of the parent. Communication may occur via telephone or computer . . . If there is a violation of this procedure, the police will be notified immediately.

[ECF No. 15-1]. Craft went on to explain that the discipline issue involving Bradley had been handled in accordance with school policy, but did not articulate any basis for the conclusion that Plaintiff's behavior posed a threat to school staff. Four days later, believing that Craft's letter applied only to actual educational buildings, Plaintiff went to the District's administration

3

offices. He asked to speak with Craft, and to give her a letter requesting an emergency meeting of the Brookville Area School Board ("the Board") "to address [his] concerns relating to the lack of discipline of the student who had stabbed his son . . . and [Plaintiff's] ban from school property." [Id. at ¶ 62]. The secretary informed Plaintiff that Craft had directed her to call the police if he entered the building. Plaintiff gave the letter to the secretary, and told her that he would wait outside for the police to arrive. "Eventually" the Brookville police arrived and arrested Plaintiff for defiant trespass." [Id. at ¶ 67].

Plaintiff contends that in response to written requests, he was given permission to drive onto school property to pick up his children for scheduled appointments, provided that he remained in his car. He also contends that on multiple occasions he requested permission to attend Board meetings, but did not received a response. [Id. at ¶ 67-69]. Fearing another arrest, he has not attended or attempted to attend a Board meeting. [Id. at ¶ 69, 71]. According to Plaintiff, his exclusion from these meetings transgresses his First Amendment rights.

## II.  STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations and construe them in the light most favorable to the non-moving party . Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). In Phillips, the United States Court of Appeals for the Third Circuit reiterated the pleading requirements under Rule 12(b)(6) as they were explained by the Supreme Court in Twombly v. Bell Atl. Corp., 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009). See Phillips, 515 F.3d at 233–34. These motions are to be evaluated under a three-pronged approach. First, the Court must identify the elements essential to the plaintiff's cause of action. Second, the court evaluates whether the complaint sets forth factual allegations as opposed to conclusory

statements; the former it accepts as true, and the latter it disregards. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009). Third, if the complaint sets forth factual allegations, the Court must determine whether they support a claim to relief that is plausible on its face. See Iqbal, 129 S.Ct. at 1950, 1953. The plausibility requirement is met when the plaintiff pleads facts that allow the court reasonably to infer that the defendant is liable for the misconduct alleged. Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009). This standard does not impose a probability requirement at the pleading stage, but instead requires that the facts alleged be sufficient to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of the claims made. See Iqbal, 129 S.Ct. at 1949; Phillips, 515 F.3d at 234.

## III. DISCUSSION

### A. Individual Liability - Craft

In order to establish a claim under 42 U.S.C. § 1983,[2] a plaintiff must show that a person acting under color of state law deprived him of a right secured by the Constitution or the laws of the United States. Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000). In Hafer v. Melo, 502 U.S. 21, 25 (1991), the Supreme Court clarified "the distinction between personal – and official capacity suits" brought pursuant to section 1983. "[T]he phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." Id. at 26.

"[O]fficial capacity suits 'generally represent only another way of pleading an action

---

[2]This statute provides, in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

5

against an entity of which an officer is an agent.'" Id. at 25 (citations omitted). Thus, state officers sued in their official capacities are not "persons" for purposes of section 1983. "Personal – capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." Id. "A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term 'person.'" Id. at 26. "On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Id. (citations omitted).[3] Individual liability is not limited to acts taken under color of state law that are "outside the official's authority or not essential to the operation of state government." Id. at 28. An official sued in her individual capacity, unlike one sued in her official capacity, may, however, claim the defense of qualified immunity if she can establish that the challenged action was a result of reasonable reliance on existing law. Id. at 25.

Qualified immunity is an affirmative defense which must be decided as a matter of law by the court. Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004). Pursuant to this doctrine, "[o]fficials exercising discretionary powers are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" D.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1368 (3d Cir. 1992) (citing Harlow v. Fitzgerald, 457 U.S. at 818)). "[Q]ualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Groh v. Ramirez, 540 U.S. 551, 571 (2004) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The Supreme Court has stressed

---

[3] Craft misstates the doctrine of individual liability when she argues that she cannot be liable in her individual capacity because she "was acting in her role or capacity as Superintendent of the Brookville Area School District. Further, the relief sought . . . relates to public School Board meetings under the direct control and authority of the Board of School Directors of the Brookville Area School District." [ECF No. 18 at 56].

6

that district courts must address qualified immunity at the earliest possible point in the litigation. See Saucier v. Katz, 533 U.S. 194 (2001). Therefore, a determination regarding qualified immunity is appropriately assessed in the context of a Motion to Dismiss pursuant to Rule 12(b)(6), or, if there are unresolved relevant factual disputes, at summary judgment. An immediate appeal is available where a motion to dismiss invoking qualified immunity is denied. See Behrens v. Pelletier, 516 U.S. 299, 308 (1996).

It is the plaintiff who bears the burden of pleading facts sufficient to overcome an assertion of qualified immunity. See id. The qualified immunity test has two prongs; the allegation of a constitutional violation, and whether that right was clearly established at the time of the violation. See Conn v. Gabbert, 526 U.S. 286, 290 (1999). The order in which these prongs are addressed is irrelevant. "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). In this case, the Court deems it appropriate to proceed directly to the second prong.

Typically, "state officials 'performing discretionary functions' are entitled to qualified immunity." Harlow, 457 U.S. at 818. An official sued in her individual capacity is entitled to immunity unless the constitutional right at issue was clearly established at the time of the alleged violation. A right is clearly established where its parameters are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Even if the right *is* clear, an official may still claim qualified immunity where she made a reasonable mistake regarding the law's requirements. See id. at 205. "Generally, an official who is entitled to qualified immunity

7

can claim it if the alleged conduct was prescribed by orders or regulations and the official had no reason to know he was violating plaintiff's constitutional rights." Liberty and Prosperity 1776, Inc., v. Corzine, 720 F. Supp. 2d 622, 638 (D.N.J. 2010) (citing Schatz v. McCaughtry, 87 F.3d 1316 (7th Cir. 1996)).

Based on the facts alleged, the Court finds that Defendant Craft is entitled to qualified immunity. Her decision to bar Plaintiff from school property was made at the direction of Chief Dworek, allegedly for security reasons.[4] Chief Dworek and Officer Markle, who had multiple encounters with the Plaintiff, notified Craft that Peters posed a genuine threat to school staff. There is nothing to suggest that Craft acted unreasonably in relying on the officers' conclusions. Given their interaction with Plaintiff at the police department, the officers had information about his conduct and demeanor that Craft may well have assumed went beyond that available to her. Chief Dworek communicated what seemed to be a legitimate concern to Craft, and Craft did what the officers directed her to do. Given the facts described in the Second Amended Complaint, the Court is not prepared to say that Craft, in implementing Chief Dworek's directive, could or should have understood that her compliance with the officers' request amounted to a clear violation of Plaintiff's First Amendment rights.

Craft's letter to Plaintiff does not mention access to Board meetings, and Plaintiff's assumption that he would have been removed from these meetings is speculative. At the time the letter was sent, Plaintiff had not sought to meet with the Board, nor has he attempted to do so

---

[4] Plaintiff alleges in his Second Amended Complaint - and Craft does not contest - that it was Officer Dworek who directed Craft to ban Plaintiff from school property. [Id. at ¶ 61]. Yet, Plaintiff does not suggest any motive – other than security concerns – that Officer Dworek might have had for excluding Plaintiff from school property. Plaintiff's argument that Craft was acting at Chief Dworek's behest undercuts his argument that Craft sought to impose a ban on Plaintiff's attendance at Board meetings because she wanted to quash further discussion of the students' altercation. Plaintiff does not suggest what interest Chief Dworek might have had in precluding this discussion, or that Officer Dworek and Craft conspired to violate his constitutional rights.

8

since. He was, however, notified that he was free to contact the school via telephone or email. Plaintiff does not allege that he used these alternate means to attempt communicate with the Board, that these modes of communication were inadequate, or that he shared with Craft concerns about infringement of his First Amendment rights.

Given the totality of the circumstances, it is conceivable that Craft would not have realized that her letter raised an issue under the First Amendment. The letter establishes that she viewed the incident between the two students as a relatively minor one which did not implicate public concern. According to Craft, "[t]he dialogue of appropriate behavior and possible consequences is a subject of discussion among a teacher, a child and his/ her guardians." [ECF No. 20-1]. She also wrote that "the District is not permitted to share . . . discipline consequences involving other students in the class." Id.

Plaintiff does not cite any factually similar legal authority that should have alerted Craft that she was violating Plaintiff's First Amendment rights. Barring Plaintiff from school property did not itself constitute a First Amendment violation, and even excluding him from the meetings he later asked to attend, was not, according to her letter, based on content-related speech. Plaintiff's contention that Craft's stated reason for banning him from Board meetings was pretext, and that her real motivation was preventing Board members from learning how she handled the student altercation, is not persuasive. In fact, Plaintiff's allegations suggest that Craft was quite confident in her resolution of the matter - as were the police. Thus, she had no independent reason to conceal her actions from or inhibit discussion of the incident with the Board.

The Court finds that the law pertaining to Plaintiff's rights under the First Amendment was not, in the context of the facts, "sufficiently clear that a reasonable official would [have

understood] that what [s]he [was] doing violate[d] that right." Saucier, 533 U.S. at 202 (quoting Anderson, 483 U.S. at 640). Furthermore, even if the Court were to assume, arguendo, that Plaintiff's First Amendment rights were, in the circumstances, clearly established, it finds that the facts in this matter were unusually convoluted, making any mistake on Craft's part with respect to compliance with controlling law objectively reasonable. See id. at 205.[5]

### B. Municipal Liability – The Brookville Area School District

In order to state a section 1983 claim against a school district, a plaintiff must allege the requisites for municipal liability as articulated by the Supreme Court in Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978). See also Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006); Graham v. Ambridge Area Sch. Dist., C.A. No. 07-1640, 2010 WL 2207999 at *6 (W.D. Pa. May 26, 2010); Madrid v. Anthony, 510 F. Supp. 2d 425, 431 (S.D. Tex. 2007). "When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." Muller v. Bristol Twp., C. A. No. 09-1086, 2009 WL 3028949 at *3 (E.D. Pa. Sept. 17, 2009) (quoting McTernan v. New York, 564 F.3d 636, 657 (3d Cir. 2009) (internal citations omitted)).

Nowhere in his Second Amended Complaint or in his brief opposing the Defendants' Motion does Plaintiff allege a relevant municipal policy or custom. The decision in Monell, as it applies to the Board, is neither cited nor discussed. Defendants' Motion to Dismiss the claim against the District will, therefore, be granted.

---

[5]The Court emphasizes that its holding is context specific and should not be construed to mean that a school board may, with impunity, approve blanket exclusions of parents from its meetings.

## IV. CONCLUSION

For the reasons set out above, the Motion to Dismiss [ECF No. 17] will be granted as to both Defendants.

Dated: October 3, 2011

By The Court,

/s/ Maureen P. Kelly
United States Magistrate Judge

cc: Counsel of Record via CM-ECF